### GAGLIO v. CITY OF NEW YORK et al.
### No. 417.

Circuit Court of Appeals, Second Circuit.

July 13, 1944.

Vincent J. Cuti, of New York City (L. Ray Glass, of New York City, of counsel), for appellant.

Ignatius M. Wilkinson, Corp. Counsel, of New York City (Albert L. Wilbur, of New York City, of counsel), for appellees.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

**AUGUSTUS N. HAND, Circuit Judge.**

The question raised by this appeal is whether the plaintiff, who, on October 14, 1942, fell off the platform of the elevated station at 183rd Street and Third Avenue, in the Borough of the Bronx, City of New York, and was run over by an approaching train, established any claim to recover for the injuries which he suffered. He brought this action both against the City and Mayor LaGuardia on two counts, the first for neglecting to maintain proper lights at the station, and the second for creating and maintaining a nuisance at that place, whereby the plaintiff suffered injuries and became entitled to recover damages. After a long trial, the court, having reserved decision, upon a motion by the defendant for a directed verdict, submitted the case against the City to the jury, which rendered a verdict for the plaintiff in the sum of $15,000. The court thereafter set the verdict aside and directed judgment for the City. The complaint against the Mayor had previously been dismissed as against him on the ground that it failed to state a cause of action. We think that the case was correctly disposed of in the District Court and that the judgment should be affirmed.

The principal question of law and the only one that we need decide is whether the New York State War Emergency Act (L.1942 ch. 544, § 40)[1] afforded immunity to the defendants from the plaintiff's claim because they were "in good faith carrying out, complying with or attempting to comply with" dim-out regulations at the elevated station where the plaintiff suffered injuries because of alleged insufficient lighting.

After the raid at Pearl Habor, Emil E. Dorting, supervisor of lighting for the New York City Transit System, was asked by Mr. Pfeifer, the general superintendent of the System, to cooperate with an electrical engineer in making tests to determine methods of dimming out lights in the outdoor portions of the transit system in the event of air raids over the city. About January 15, 1942, Captain Kamy was sent to New York by Major Everett, Executive Officer of the Army Engineer Board, for a conference with the engineers of the New York City Transit. Tests were made with lamps having different wattages and different apertures for emitting light in order to determine the amount of illumination that each bulb would furnish and the angle of the light coming from it. About January 29, 1942, the city was notified that it should cooperate with Colonel Lewis Robbe, in charge of the Office of Civilian Defense in the district and later, at his request, engineers from lamp companies and scientific laboratories were invited to witness the result of tests for blackouts and dimouts. After tests had been made by the City Transit with proper instruments for measuring illumination, and after airplanes had flown overhead under arrangement with army officials and had observed the results of the tests, 10 watt lights with

---

[1] Sec. 40. "Immunity from liability.

"1. Neither the state nor any municipality thereof, nor their agencies, agents or representatives, nor any member of a municipal or volunteer agency, nor any individual, partnership, corporation, association, trustee, receiver or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any law or duly promulgated rule, regulation or order as defined in subdivision eleven of section two of this act or any federal law or any order issued by federal or state military authorities relating to civilian protection, shall be liable for any injury or death to persons or damage to property as the result of such activity.

"The foregoing shall not affect the right of any person to receive benefits to which he might otherwise be entitled under the workmen's compensation law, any pension law or the general municipal law, nor the right of any person to receive any benefits or compensation under any act of Congress. * * *"

⅝ inch openings were selected for blackout lighting and 36 watt lights with 1¼ inch openings were selected for dimout lighting at elevated stations. In order to make a very practical test the city officials at one time made up a train of four cars, each equipped with a different form of dimout lighting and about 200 people were allowed to accompany it on two round trips from 177th Street. It stopped at each station, so that the observers could get off the train, walk down the stairs to the street and return again to the platform and train. The stations were equipped with the same blackout lights that were subsequently installed on all outdoor stations, including the 183rd Street Station at which the accident occurred. As a further safeguard to the public, a yellow line, 4 inches wide, was painted along the outer edge of each station platform which Dorting said was visible its entire length, even when 10 watt lights were used in cases where trains might have to be run during blackouts. Special further tests for dimout lighting were made after an urgent appeal by the army in May, 1942, to reduce the skyglow over the city because ships were found to be silhouetted against the glow and thus to be easily located and torpedoed.

The result of all these elaborate investigations, only the outlines of which we have sketched, was the installation of two rows of 36 watt lights 15 feet apart, and one row of 10 watt lights 20 feet apart on 265 outdoor stations of the Greater New York Transit System which evidently met the approval of army officials and engineers.

There was no witness of the plaintiff's fall from the platform of the 183rd Street Station. He testified as to that as follows: "I walked up and went up to the station and paid my fare, walked in and got onto the platform and sat down. I heard the train coming, and as I heard the train coming I got up to meet it to board it, and all of a sudden I found myself in the air. That is the last I remember." He further testified that he did not at any time see the train, that he noticed it was dark and the lighting along the platform was not evenly spaced. He said that while he could see lights overhead, as he sat on a bench on the station platform, only about six feet from the outer edge, he could not see the platform itself and walked out into the darkness in order that he might be sure to board it when it had come in.

Major General T. A. Terry promulgated regulations governing the control of artificial lighting in the Second Corps Area on June 1, 1942, after all the tests and investigations which we have recounted had been made with the knowledge and cooperation of the army. Three of the regulations were as follows:

"4. All lights normally visible from the sea shall be dimmed or shaded in such a manner that they will not be visible under any conditions at a distance of more than one mile from the shore. If they cannot be so dimmed or shaded, they shall be extinguished."

"5. All exterior lights used for illumination or guidance of traffic (such as street lights) and all lights used for security measures or necessary outdoor protection, outdoor manufacture, storage or shipping of war materials (such as floodlights or artificial illumination in freight yards, docks or shipyards), shall be reduced in volume, number or wattage to a minimum consistent with their purpose and shaded so as to prevent their direct rays shining at an angle above the horizontal."

"6. All other exterior lights used for illumination of open areas, such as parking lots, playgrounds, places of amusement or entertainment, sidewalk cafes, marquees, open-air gardens or terraces, etc., must be so shaded as to prevent their lights shining at an angle above the horizontal and the combined lighting of such areas may not exceed the average of one-quarter watt per square foot, and no individual light used for such purposes shall be in excess of one hundred watts at the rated voltage."

It is argued on behalf of the appellant that less light was afforded for platforms of the elevated railroad than was required in order to conform to the regulations, and that if shades set at a proper length and angle had been used for the bulbs rather than bulbs the upper part of which was painted black, there would have been more light on the platforms, and the regulations would at the same time have been complied with. It seems impossible to believe that the lights were not in essential conformity to the requirements of the army. The fact that those used sufficiently safeguarded the public seems evident since about 100,000 passengers resorted to the station at 183rd Street during the dimout hours that preceded the accident without any other claim being presented for injuries resulting from

insufficient lighting. It could hardly have been foreseen that a passenger who had difficulty with seeing at the station would plunge into the darkness without waiting for his train to arrive.

But the immunity statute of the State of New York, which we have quoted, was effective if the city was "in good faith carrying out, complying with or attempting to comply with any law or duly promulgated rule * * * or any federal law or any order issued by federal or state military authorities relative to civilian protection * * *". We feel no doubt that the measures taken by the city were adequate for the reasonable protection of citizens in view of the emergency and in any event that it would be quite fantastic to hold that there was not a bona fide attempt to comply with the army regulations. Plaintiff's attorney refers us to Jones v. Gray, 267 App.Div. 242, 45 N.Y.S.2d 519 where the question of whether an air-raid warden made a bona fide attempt to comply with blackout regulations and was entitled to immunity under the State War Emergency Act was involved. It is evident from the facts recited in the opinion that the air-raid warden was conducting himself so recklessly that there was sufficient evidence to support the jury's finding that he was not acting in good faith. The decision in no way indicates that there is a question which should have been left to the jury in the case at bar.

It is argued that because plaintiff testified that he could not see and that some of the lights were unevenly spaced, a jury might assume that some of the lights were out. This is not only all highly speculative and contrary to the evidence of actual installation and maintenance of the lights, but is one of those cases where the courts have frequently disregarded the negative testimony of a person who says he did not see something where there is clear proof that it was actually there. Foley v. New York Cent. & H. R. R. Co., 197 N.Y. 430, 90 N.E. 1116, 18 Ann.Cas. 631; Culhane v. New York Cent. & H. R. R. Co., 60 N.Y. 133.

In respect to the claim against Mayor LaGuardia there can be no question that it was properly dismissed. It could not have prevailed even if he had actively directed the dimout lighting because of the immunity statute, but even in the absence of such a statute, the action would have to fail since no claim was made of improper appointments to the Board of Transportation, which was the body charged with the duty of operating the railway, and there is no claim that he personally interfered with the duties of the Board of Transportation.

For the foregoing reasons the judgments and orders appealed from are affirmed.