SMITH et al. v. TOWN OF ORANGE-
TOWN et al.
No. 329.

Circuit Court of Appeals, Second Circuit.
July 16, 1945.

Samuel L. Sargent, of New York City (Edward R. Finch and Samuel L. Sargent, both of New York City, Leonard Acker, of Brooklyn, N. Y., and Emanuel Thebner and Joseph H. Sand, both of New York City, of counsel), for plaintiffs-appellants.

William E. Lowther, of New York City, for defendant-appellee, Town of Orangetown.

Evans, Rees & Orr, of New York City (William E. Lowther and Fred H. Rees, both of New York City, George S. Writer, Jr., of Nyack, N. Y., William G. Walsh, of New York City, and Joseph A. McCabe, of Poughkeepsie, N.Y., of counsel), for Max Friedman defendant-appellee.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiffs sued to recover damages growing out of an accident which occurred on the evening of November 22, 1943 when a motor vehicle owned and operated by the defendant, Max Friedman, a police officer of the Town of Orangetown, a municipal corporation in the County of Rockland, State of New York, struck Charles Lee Smith (now deceased) and five other plaintiffs, all of whom were men enlisted in the United States Army marching south upon a state highway in Rockland County, with a battalion from nearby Camp Shanks. Max Friedman was operating his privately owned automobile in a southerly direction along this highway, and at the time of the collision Charles Lee Smith (deceased) and the other five plaintiffs were marching south along the highway in front of the Friedman vehicle. Under orders of their commanding officer they were marching to the right of the center of the highway in contravention of Section 85 of the Vehicle and Traffic Law of the State of New York, Consol.Laws, c. 71, which, by its terms, directs that pedestrian traffic shall keep to the left on the center lane of the highway. In other words, the soldiers were walking with the traffic instead of against it, as required by that statute.

The accident occurred during the course of an air-raid blackout alarm. Friedman, as a member of the police department of the Town of Orangetown, was under orders to report at police headquarters in Sparkhill if a blackout alarm sounded. When the siren sounded on the night in question, Friedman was off duty and in a drug-store in Nyack about five miles distant from Sparkhill. On the sounding of the siren, and in accordance with his orders, he left the store, got into his car and proceeded by the most direct route from Nyack to Sparkhill. While endeavoring to reach his headquarters at Sparkhill he collided with the soldiers who were marching on the right side of the road as forbidden by the New York statute but required by army regulations which prescribed marching on the right side.

On November 22, 1943, at 9:28 p. m., the blue signal for a blackout was given at Spring Valley by George W. Wallace, the Director of Civilian Protection for Rockland County. The Civilian Protection forces were organized under the authority of the New York State War Emergency Act, Laws 1942, c. 445, as amended by Laws 1942, c. 544. On January 27, 1943, the Service Command of the United States Army at Governor's Island issued Air Raid Protection Regulations, subdivision 19 of § 11 of which directed that upon the sounding of this—"the 'blue' signal"—"civilian defense forces will mobilize or remain mobilized." On April 23, 1943, the State Director Thomas promulgated a regulation "adopting" the federal regulations and on April 27, 1943, Wallace, the Rockland County Director, issued a memorandum also adopting the federal regulations. He had previously notified Kennedy, the Chief of Police of Orangetown, that "all police activities under the Civil Defense Program are directly under the supervision of the Chief of Police of the area affected" and Kennedy had instructed Friedman prior to the time of the accident "to report to Police Headquarters at Sparkhill upon hearing a signal notifying him of a blackout". It was in accordance with this instruction of Kennedy that Friedman started for headquarters at Sparkhill on hearing the blue signal.

The plaintiffs introduced evidence that when about one-quarter of a mile from the place of the accident Friedman was coming up a rise in the road which was such that he could not see the road on the other side of the acclivity, that he passed two cars bound in an opposite direction with their bright lights on, which he claimed temporarily blinded him. He testified that he was then going about 30 miles per hour but kept driving ahead merely taking his foot off the accelerator and that the accident happened "almost right after". The soldiers were marching on the right side of the road as

they were required to do by their orders and officers at the rear of the battalion had been stopping cars or slowing them down and, when they saw Friedman approaching, yelled "stop" and waved their hands. But one of the soldiers, Sergeant Powell, testified that Friedman still came on at about 50 or 60 miles an hour and drove into them before they were able to escape. There were lights along the road at the time of the accident and the night was clear. From this record it is evident that there was testimony from which a jury might find that the defendant Friedman was negligent in going at an excessive rate of speed and in not noticing the warning of the officers. The plaintiffs' testimony, though substantially controverted, clearly would have justified a verdict in plaintiffs' favor had negligence been the sole test of liability. The jury may well have rendered their verdict for the defendants because of the ruling of the trial judge that there could be no recovery "merely upon the ground of negligence unless you also find that Friedman is guilty of lack of good faith in the performance of his duty." This ruling was made because of the terms of Section 40 of the New York State War Immunity Act which is as follows: "Section 40. *Immunity from liability.* 1. Neither the state nor any municipality thereof, nor their agencies, agents or representatives, nor any member of a municipal or volunteer agency, nor any individual, partnership, corporation, association, trustee, receiver or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any law or duly promulgated rule, regulation or order as defined in subdivision eleven of section two of this act or any federal law or any order issued by federal or state military authorities relating to civilian protection, shall be liable for any injury or death to persons or damage to property as the result of such activity. * * *"

Section 2, subdivision 11, of the New York State War Emergency Act defined a "duly promulgated rule, regulation or order" as meaning: "Any rule or order adopted or issued by the state council or by a local council, or any regulation or order adopted or issued by the state director or a local director pursuant to law."

The State War Council issued Official Order No. 17 relating to the speed limit of motor vehicles under which 35 miles per hour was fixed as the upper speed limit for a distance of more than one-fourth of a mile with the following exemptions:

"* * * The provisions of this order shall not apply to:

"(a) Any motor vehicle driven or operated by or under the direction of the military or naval forces of the United States, or State military forces organized pursuant to Section 61 of the National Defense Act, as amended [32 U.S.C.A. § 194];

"(b) Any motor vehicle when driven or operated in an emergency for the protection or preservation of life, health, or for public safety;

"Provided, that this paragraph shall not be so construed as to authorize any such motor vehicle to be driven or operated at a rate of speed in excess of that which is reasonable under conditions prevailing at such time."

Because of this order Friedman and the Town, but for the provisions of Section 40(1) of the State War Immunity Act, would have been liable for the negligence of Friedman if he drove at a rate of speed "in excess of that * * * reasonable under conditions prevailing." Miner v. Rembt, 178 App.Div. 173, 164 N.Y.S. 945.

The judge charged in substance that under Order No. 17 Friedman for the protection and preservation of life, health or for the public safety, might drive at more than 35 miles per hour without being liable for negligence in so driving if the jury found such excess speed reasonable under the prevailing conditions, and no objection was made to this charge. But he added that even if Friedman was found to have been negligent, Section 40(1) of the State War Immunity Act "was passed to exempt municipalities and officers of the law in the performance of their duty, who were in good faith performing their duty", and thus charged the jury: "If you find that there was no negligence, that is the end of the case. If you find even though there was negligence, that Friedman was acting in good faith in performing his duties, that would be the end of the case and your verdict would be for the defendants in each instance."

The plaintiffs requested the judge to charge that: "Nothing contained in the said Act or said direction granted to the defendant Friedman the right to operate a vehicle at a rate of speed in excess of that

which is reasonable and proper under conditions prevailing at such time."

This request was refused. If Order No. 17 defined the limits of the defendants' exemption, Section 40(1) was not needed for their protection. Order No. 17 provided a customary exemption from liability of municipalities and their agents in cases where reasonable care is exercised "under conditions prevailing". But Section 40(1) added a further ground of exemption of municipal agents who are "in good faith carrying out, complying with or attempting to comply with any law or duly promulgated rule, regulation or order." In other words, Section 40(1) established a standard not of conduct that is reasonable under the circumstances, but of the good faith of the person attempting to comply with orders. The words of the section afford no escape from this conclusion since they either provide a subjective standard of singleness of purpose and an honest intent to obey the orders given undeterred by any outside considerations or add nothing to Order No. 17. It is argued that reckless and wanton speed are incompatible with good faith, but this is not necessarily so for at most they would only be evidence in some situations that there was no honest attempt to comply with orders but other possible motives. The judge said to the jury that "Good faith denotes honesty of purpose. It is said to be a state of mind." If the uncontradicted evidence did not conclusively demonstrate the good faith of Friedman the jury had before it all the testimony as to reckless speed and could give it such weight as it deemed proper. No charge was given or requested that reckless speed was not evidence bearing on good faith.

The plaintiffs attempt to limit the exemption of good faith to officials when acting to cause a blackout. They argue that it does not extend to the ministerial actions of subordinates. There is nothing in the words of Section 40(1) to warrant such an interpretation. They broadly cover not only "agencies, agents or representatives", but "any individual * * * in good faith carrying out, complying with or attempting to comply with any law or duly promulgated rule, regulation or order * * *." It is also argued that Friedman was merely obeying the directions of Kennedy, the Chief of Police, and that Kennedy had promulgated no order. All this is most technical for, as we have already observed, U. S. Headquarters had issued regulations that upon the "blue signal"—"civilian defense forces will mobilize", and these regulations had been adopted by the State Director and the County Director, and subdivision 11 of Section 2 of the War Emergency Act defined a duly promulgated rule, regulation or order as meaning: "Any rule or order adopted or issued by the state council or by a local council, or any regulation or order adopted or issued by the state director or a local director pursuant to law."

The plaintiffs seek to support their appeal by the decision of the Appellate Division in Jones v. Gray, 267 App.Div. 242, 45 N.Y.S. 2d 519, 523, which in no way aids them but is against the position they take. There an air raid warden had received a warning signal. Instead of proceeding immediately to his post he loitered about a quarter of an hour at a store, waiting for a couple of girls and a young man to accompany him and after he had assembled them driving toward his post, without lights, and down grade, at a high rate of speed. In the course of this "joy ride" he collided with the plaintiff who sued for damages resulting from the collision. The judge submitted to the jury the question whether the air raid warden was "in good faith, carrying out, complying with or attempting to comply with any law or duly promulgated rule, regulation or order, as defined in subdivision 11 of Section 2 of the New York State War Emergency Act" and they answered the question in the negative. On appeal the defendant contended that the court should have directed a verdict for him on the ground that his "good faith" was proved beyond a doubt because he was on his way to his post when the collision occurred. The Appellate Division held that the question of good faith was for the jury and was not to be "conclusively presumed as a matter of law from the single fact alone that at the time of the collision he was proceeding in the general direction of his air raid post, and irrespective of all the other evidence as to his conduct prior to that time * * *." In Gaglio v. City of New York, 2 Cir., 143 F.2d 904, we held the view that good faith gave exemption under the War Emergency Act. The difference between that case and the present was that there the trial judge directed a verdict for the defendant because the facts showing good faith in complying with dim-out regulations were so very plain and we sustained his action.

It is also argued that the charge as to contributory negligence was prejudi-

cial to the plaintiffs on the ground that the evidence showed that there could not have been any. But no objection was made to the charge on this ground and no correction of it was sought. The judge said in this connection: "Well I don't know that any is claimed. Perhaps it is. You are to consider it * * * if they were guilty of any contributory negligence, they can not recover." He then told the jury they could not consider the fact that the soldiers were marching under orders on the west side of the road as an element of contributory negligence, but they could consider the circumstances whether Friedman expected to find them there in determining the question of his negligence. He said that if the soldiers "by the exercise of reasonable caution could have avoided the accident * * * their failure to do so would be contributory negligence", but that they could not be guilty of contributory negligence by reason of the fact that they did walk on the west side of the road, because so far as they were concerned as soldiers, the orders of the colonel and their superior officers were paramount and they had to obey them. All this was accurate. While the charge treated with skepticism any claim of contributory negligence, the court properly left the jury to determine whether contributory negligence existed since the soldiers marched without flashlights and with no means of warning but shouting to approaching cars. At any rate, at this late day it should not be held that contributory negligence was not a question for the jury when nobody suggested at the trial that it ought to be treated otherwise.

A further objection is made to a statement in the charge that Section 50-c of the New York General Municipal Law, Consol. Laws, c. 24, would exonerate a policeman from liability for negligence if he was acting in performance of his duties and within the scope of his employment. But the objection overlooks the fact that the charge went on to say that both the Town and Friedman were liable for the latter's negligence, if not exempt under the "good faith" provision of Section 40(1) of the War Emergency Act, though under Section 50-c of the General Municipal Law the Town would save Friedman harmless from a recovery. (Fols. 784-5).

■ The contention that Section 40(1) is unconstitutional is wholly without merit. It was never made before the trial court but in any event exemption of persons attempting in good faith to carry out orders relating to civilian protection from liability was a valid exercise of the police power of the State. Matter of Cheesebrough, 78 N.Y. 232, 236; People ex rel. Durham Realty Corporation v. LaFetra, 230 N.Y. 429, 442, 130 N.E. 601, 16 A.L.R. 152. As Judge Dillon said in his treatise on Municipal Corporations, at page 274: "If one suffers injury * * * in the theory of law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure."

■ Last of all, prejudicial error is claimed because defendants' counsel argued in his summation that if the Town and Friedman were acting in good faith the jury should bring in a verdict for the defendants and "relegate" the soldiers to the Government of the United States to make such provisions as it should make "for their rehabilitation". If nothing more had been said, this might have tended to misguide the jury, but the court intervened by saying: "Now the government doesn't pay any damages", and counsel replied: "No the government is not responsible in damages that is true * * *." Thus it was made clear that the defendants' counsel was only arguing that his clients were not liable because they acted in good faith in carrying out orders but that the government in such circumstances ought to make restitution. Plaintiffs' counsel apparently objected to the summation only because it was not fair to suggest that the government would pay when it was under no obligation to do so. He did not ask for a mistrial on this ground, or mention it when he moved to set the verdict aside. Moreover, the court gave clear instructions as to this ill-advised argument not only in the main charge but in subsequent instructions at the request of plaintiff's counsel who seems to have acquiesced in the way the matter was submitted to the jury. These instructions were as follows:

"You can't consider, * * * that perhaps there might be some legislation paying these boys who were injured. You can't consider anything like that, because that would be guess, surmise and speculation.

"You can't consider that if they were disabled, if insurance had been taken out, that they were going to get some insurance. You can't consider those things. That is all guess, surmise and speculation. You cannot decide this case upon that. You can only decide it upon the evidence."

After the main charge was concluded, and at the request of plaintiffs' counsel, the court further charged the jury as follows:

"The Court: The jury must disregard any reference made by defendants' counsel respecting the alleged claims of the plaintiffs against the government of the United States."

"* * * You are not to speculate as to whether the government should make provision for these men or whether these men have any insurance or anything of that kind. Don't base your decision upon guess, surmise or speculation."

If our view of the exemption afforded to persons attempting in good faith to comply with the black-out order be correct the plaintiffs had a case so weak in view of the terms of the statute as almost to call for a directed verdict. While we deeply regret the tragedy which occurred, yet it seems clear that we ought not to reverse a judgment for the defendants because of remarks of their counsel which the jury were instructed to disregard, particularly in a case in which the evidence so overwhelmingly indicated that a verdict should not be rendered for the plaintiffs upon the record presented.

Judgment affirmed.

CLARK, Circuit Judge (dissenting).

The extreme extent of the blanket exemption granted not merely municipalities, but all minor air raid officials, under the interpretation here given to the New York State War Emergency Act, § 40, I think should give us pause before we finally conclude that such must have been the necessary legislative intention. Here the court's instructions to the jury in substance required it to exonerate this police officer, and the town which employed him, upon a showing of his subjective intent to obey a directive to report promptly at his police headquarters on warning of an air raid drill—this notwithstanding that the evidence, reasonably construed, showed that he was driving his own motor vehicle at night on an inland main highway at such a rate of speed as to run past warning signals and crash into a company of soldiers trapped there by reason of the orders under which they were marching, killing one and severely injuring five others. Of course, the evidence as to the operation of the vehicle was in dispute; but the devastation wrought and the mute evidence from the damaged car itself lend credence to an estimate of a speed of 50 or 60 miles an hour given by Sergeant Powell, one of the plaintiffs. In short the statute, as thus construed and applied, excuses extreme recklessness, when compliance with the police order of a superior is asserted. True, even though they now seem rather exaggerated after the end of the war with Germany, we are not entitled to discount all former fears of actual air raids, or the extensive steps then taken to repel invasion by air. But we can doubt whether the New York legislature intended to go so far as this to excuse recklessness in connection with air raid drills, wherever occurring in the State, or whether the orders of the State War Council—of vital importance in this case as I view it—permitted such driving nearly two years after war had begun and when every one (this police officer along with the rest of us) knew the odds were overwhelming that this was only a practice drill, not an enemy attack.

Plaintiffs suggest several possibilities for interpretation of the Act, which I do not wish to reject definitively in stressing, as I shall do, what seems to me the least favorable interpretation—so far as they are concerned—to be given it. I may add that there were certain disturbing features of the trial—the charge on contributory negligence, the argument of counsel—which I shall pass, since it is obvious that if the construction here given the statute stands, a new trial will avail the plaintiffs nothing. I shall limit my remarks to what I think has been overlooked, namely, that the State War Council's Order No. 17—authorized by § 7 of the Emergency Act—is a valid and controlling part of any directive for the execution of which in good faith a defendant claims immunity. True, the court referred to this order, quite properly, on the issue of negligence; but then it allowed no effect whatsoever to the order on the issue of good faith—the more important and overriding issue as the case developed. But Friedman must be held under orders not merely to get from the drugstore in Nyack to the police headquarters in Sparkhill, but to do so when driving as specified in the order. This sets a speed limit of 35 miles an hour; in addition, it has an exemption for military and naval driving, which seems definitely not applicable here, and one for driving in an emergency for public safety, which by generous interpretation perhaps may be. Nevertheless, and in any event, the vehicle must not be driven "at a rate of

speed in excess of that which is reasonable under conditions prevailing at such time." Thus the jury should have been told explicitly that the excuse of good faith could operate only when the officer intended to obey his order by driving as thus reasonably stated and required. Instead plaintiffs were required to prove the *absence* of good faith "in carrying out, complying with or attempting to comply with the law or duly promulgated rule, regulation or order requiring him to report."

The proper construction of the statute was brought home to the court, since it was the most stressed legal point in the case; and three requests to charge in particular asked for a statement that Friedman had no "right and privilege" to drive without regard to speed and the safety of persons on the highway, or in a dangerous, reckless, or wanton manner, or at a rate of speed in excess of that which was reasonable and proper under the conditions, and further that nothing contained in the direction to him to report promptly to the Sparkhill headquarters granted him such right and privilege. True, on the theory here stated these requests did not express the full rule of law, since even if he lacked the *privilege* his good faith might excuse him. But I think they, as well as the general arguments as to the statute, put the court on warning of the necessary interpretation; and in a case of this novel importance and serious consequence, a meticulously framed exegesis of the law was not to be required of plaintiffs for the preservation of their appellate rights. The court made thoroughly clear its different interpretation of the statute, both in its charge and later in its opinion denying the motion to set aside the verdict. D.C.S. D.N.Y., 57 F.Supp. 52.

No other case goes as far as this in extending the statutory exemption. Our previous Gaglio case, cited in the opinion, supra, was one not of reckless conduct during an air raid drill, but of compliance by the elevated railway with normal regulations of the black-out period. The state case of Lofaro v. Bee Cab Corporation, 180 Misc. 756, 43 N.Y.S.2d 737, quite properly and pointedly suggests that the statute does not provide a blanket immunity from liability to all motorists using public highways at night in accordance with wartime regulations, a suggestion repeated in the advice that insurance coverage was needed for a state military ambulance. Aug. 29, 1944, Ops. N. Y. Att'y Gen. The case of Jones v.

Gray, cited in the opinion, supra, too shows that an air raid warden may be held for collision and, by its contrast, perhaps the more emphasizes the dangers of a rule allowing a living defendant's statement of his own subjective intent so extensive a scope as here. For in that case the air raid warden was deceased, and the court allowed the jury to infer absence of good faith from the circumstances there present. Here the circumstances certainly tended to show an absence of good faith on the part of Friedman in intending to comply with the order to drive at a speed reasonable under the prevailing conditions, and that issue should not have been removed from the jury.