Does, J.
During the darkness of a city-wide blackout in 1942, plaintiff, while acting as an air raid warden, stepped over a parapet on the roof of a structure covering the boiler room .and laundry in the courtyard of defendant’s apartment house, and fell to the yard ten feet or more below, sustaining serious injuries. After trial before the court without a jury, plaintiff was awarded judgment for $40,000 against defendant, owner of the premises. Defendant appeals.
On appeal no issue is raised as to the amount of damages, but the important issue presented is the effect of the New York State War Emergency Act granting immunity from liability to individuals and corporations complying in good faith with any order relating to civilian protection. (L. 1942, ch. 544, § 40,' eff. May 1, 1942.)
Plaintiff, tenant in defendant’s apartment house, 90 Riverside Drive, New York, N. Y., testified that on a previous air raid drill, about thirty days before the accident, he had been assigned by another tenant, a supervising air raid warden, to his post on a roof outside the lobby windows; that defendant’s superintendent, who was also a supervising air raid warden, had told him to step out of a lobby window on the roof in question and that the roof was “ a straight-away * * * just a straight roof.” On that first blackout, he and another warden, after observing from the roof and then reporting lights in upper apartments, returned safely to the lobby through the same window through which they had gone out. At that window, the extension roof in question was flush with the wall of the main building and about two feet, three inches below the window sill. To the east of that window there was a rectangular air shaft about twelve feet long and five and one-half feet wide, the yard of which was approximately ten feet below the extension roof. Opposite this air shaft was another lobby window facing the roof which at that point was not flush with the main wall of the building, but by reason of the rectangular air shaft was about five feet, six inches from that wall. Along that part *229 of the roof which was not flush with the main building there was a stone parapet nineteen inches above the roof. The lobby windows were of very dark stained glass, not transparent.
On May 22, 1942, the night of the accident, plaintiff testified he again served as air raid warden and with two other wardens again went out on the same roof through the same lobby window to the same posts. As they saw lights in the upper floors, they called out the lighted apartment to someone seated at the house switchboard in the lobby who in turn called the apartments and asked that the lights be extinguished. Plaintiff testified that when all the lights were out, he heard the superintendent’s voice, through the one window that was then open and showing any light, say, “Now that the lights are out, you fellows can come in.” Plaintiff said he then walked toward the one lobby window where a light was showing; that he could recognize people inside “ very hazily ”; that he put his foot over what he thought was the same window sill over which he had stepped out on the roof, and then fell into the air shaft yard below; that till then he had never known of the existence of the air shaft; and that he had no knowledge of anything beneath the roof and as far as he was concerned it could have been the yard or ground floor. He said it was dark when he started to walk to the window; that he did not use or see any flashlights used and did not see where he was putting his foot when he stepped over. He also testified he thought the window he had come out of was closed at the time he returned.
Plaintiff’s wife testified that on the night of the accident she served as switchboard operator; that after her husband and the other men went out the first lobby window to the roof, the window through which they had gone was closed because of the blackout; that the superintendent opened the other lobby window to the east which was nearest the switchboard — the window facing the air shaft, and the superintendent called through the window to the men on the roof to “ come on in.” 6 The superintendent, defendant’s witness, admitted that he gave no warning of the presence of the shaft and that the window opposite the switchboard was open, but he denied that he had opened or closed any lobby windows during the drill, that he had called to the men on the roof to come in, and that plaintiff’s wife was at the switchboard on the night of the accident.
In an opinion the trial court held that defendant’s admitted failure to warn of the presence of the air shaft, which the court found was a “ hidden danger or trap ” in the total darkness. *230 was “not a good faith compliance with the act”; that to obtain the immunity of the statute “ either the condition or the instrumentality causing the injury must be occasioned by or used in air raids or drills ” that the recession of the roof adjacent to the open window and the failure to warn of the hidden hazard was not due to or consequent upon an air raid drill; that plaintiff was not guilty of any contributory negligence, and that the War Emergency Act was no defense.
We think the judgment is erroneous and should be reversed. The controlling condition contributing to cause the accident was the very condition the air raid drill was intended to produce, namely, total darkness. On the facts disclosed in this record the War Emergency Act furnished defendant immunity from liability. The relevant portion of that act reads as follows:
“ § 40. Immunity from liability. 1. Neither * * * any individual * * * corporation * * * or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any * * * order * * * relating to civilian protection, shall be liable for any injury * * * to persons * * * as the result of such activity.”
By the enactment, the Legislature obviously intended to give immunity to owners of buildings complying or attempting to comply in good faith with orders relating to civilian protection. In view of the emergency conditions existing during World War II, the act was a valid exercise of the police power. (People ex rel. Durham R. Corp. v. LaFetra, 230 N. Y. 429, 448; Finkelstein v. City of New York, 295 N. Y. 730; Smith v. Town of Orangetown, 150 F. 2d 782 [C. C. A. 2d].)
It was conceded that on the night of the accident a citywide blackout was ordered by properly constituted authority. Defendant, in permitting the lights in the house to be extinguished and the wardens to go onto the roof, was complying with an order relating to civilian protection.
Plaintiff essentially relies on the combination of (1) the conceded failure to warn of the construction of the roof and" the presence of the air shaft with knowledge that air raid wardens were out on the roof at night and that total darkness was about to be produced; and (2) plaintiff’s claim that the superintendent closed the first window through which plaintiff had safely gone out, opened the second window opposite the shaft, and called through that open window to the men on the roof “ to come in.” The superintendent, who for two years before the trial was no longer in defendant’s employment, denied the latter contested claims ([2] above). Two other air raid *231 wardens who were on the roof with plaintiff apparently returned in safety on the second drill, as plaintiff and another had on the first. Plaintiff admitted that he and the other two on the night of the accident “ probably circled around the roof. The other gentlemen will be able to tell you that. We circled around the roof.” In the light of plaintiff’s sixteen years’ residence in the house and four or five years in an apartment one flight above the lobby, just above and facing the courtyard, and his safely partaking in a prior air raid drill with other wardens at the same post on the same extension roof, it was not unreasonable to assume that the wardens were accustomed to the place to which they had been assigned. The other wardens were not called. In any event such failure to warn under the circumstances disclosed did not establish that defendant was not “ in good faith ” carrying out, complying with or attempting to comply with the blackout order, so as to deprive the owner of the immunity from liability granted by the act.
In Gaglio v. City of New York (143 F. 2d 904 [C. C. A., 2d], certiorari denied 323 U. S. 798) plaintiff during a dimout fell off an elevated railroad platform in front of an approaching train and was run over. An order and judgment setting aside the jury’s verdict in the plaintiff’s favor was affirmed, the court holding that the defendant was in good faith complying with the act.
In Smith v. Town of Orangetown (150 F. 2d 782 [C. C. A., 2d], supra) a police officer and a town were sued for damages resulting when the officer, proceeding in an automobile in response to orders under blackout regulations, struck soldiers marching tinder orders on the wrong side of the road, that is, with traffic instead of against it as required by the State statute. The Circuit Court of Appeals sustained a judgment entered on a jury’s verdict in defendant’s favor holding that the War Emergency Act granting immunity was applicable and that it was not unconstitutional but a valid exercise of police power of the State.
In Klein v. Herlim Realty Corp. (184 Misc. 852, affd. 269 App. Div. 934, First Dept., Oct. 1945) an air raid warden was injured in the darkness of a blackout while he was extinguishing a light the owner had failed to extinguish in violation of the War Emergency Act. Nevertheless this court sustained judgment for the defendant. The trial court had held the defendant’s negligence in failing to extinguish the light was not the proximate cause of plaintiff missing his step in the total darkness.
Jones v. Gray (267 App. Div. 242) is cléarly distinguishable. *232 In that case the defendant, an air raid warden, was traveling downgrade on the wrong side of the road without lights at a speed of over forty-five to fifty miles an hour in violation of blackout regulations, and the car it collided with was proceeding upgrade with lights on at a speed of twenty miles an hour. Defendant’s act there was so reckless that the evidence supported the jury’s verdict that he was not in “ good faith ” attempting to perform his duties in compliance with the act at the time and place of the collision.
In this case there was no hidden hazard, danger or trap in the construction of the roof. At the point where plaintiff stepped over, the roof was protected by a parapet nineteen inches high. The danger was created by the total darkness of the blackout and plaintiff’s proceeding in such darkness when he admitted he could not see where he was stepping. Defendant had no reason, to anticipate such action on plaintiff’s part. (Collins v. Noss, 258 App. Div. 101, affd. 283 N. Y. 595.)
Plaintiff had been a tenant in the building for sixteen years. For four or five years before the accident he had occupied apartment 2-B just above the lobby. Two windows of that apartment, one in the kitchen and the other in the maid’s room, overlooked the extension roof of the boiler room in the courtyard. Plaintiff claimed that during the four and one-half years that he had occupied that apartment he had never looked out of those two windows into the courtyard or to the roof below, and his wife testified without contradiction that while one could see the roof from two windows, the air shaft in question was not visible from any of her windows. On the facts disclosed plaintiff was guilty of contributory negligence. In Rohrbacher v. Gillig (203 N. Y. 413, 418) the court, in finding the plaintiff guilty of contributory negligence in proceeding through a hall that was so dark that he could not see where he was going, said: “ The principle, which these decisions have established, is that a person, coming into such an unfamiliar situation, where a condition of darkness renders the use of his eyesight ineffective to define his surroundings, is not justified, in the absence of any special stress of circumstances, in proceeding further, without first finding out where he is going and what may be the obstructions to his safe progress. That was this case. There was no good reason for the plaintiff’s proceeding as he did and having elected to walk on in the darkness, without even feeling his way, he must accept the consequences of his undue precipitation.”
We think the record does not support the trial court’s finding *233 that defendant “ in good faith ” did not comply with the act. The judgment appealed from should be reversed, with costs to the appellant, and the complaint dismissed, with costs.
Martin, P. J., and Townley, J., concur; G-lennon and Cohn, JJ., dissent and vote to affirm.
Judgment reversed, with costs to the appellant, and the complaint dismissed, with costs. Settle order on notice.